Brownie Coldiron Logging Company v. Commissioner.
Brownie Coldiron Logging Co. v. Commissioner
Docket No. 83755.
United States Tax Court
T.C. Memo 1961-145; 1961 Tax Ct. Memo LEXIS 207; 20 T.C.M. (CCH) 731; T.C.M. (RIA) 61145; May 19, 1961
*207 Frederick A. Jahnke, Esq., Executive Bldg., Portland, Ore. for petitioner. Walter I. Auran, Esq., for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: The respondent determined a deficiency of $17,494.79 in petitioner's income tax for the year 1957. The only issue remaining for decision is the correctness of respondent's determination that there should be included in petitioner's income the amount of $24,249.68 representing advances made to petitioner by the company for whom it was performing logging services under a contract. Findings of Fact The petitioner, Brownie Coldiron Logging Company, is a corporation organized under the laws of the State of Oregon, having its principal place of business at Gold Beach, Oregon. The petitioner's corporate Federal income tax return for the year 1957 was filed with the district director of internal revenue at Portland, Oregon. Petitioner employs an accrual method of accounting and files its income tax returns on a calendar year basis. The petitioner was incorporated on March 16, 1956, with authorized capital consisting of 1,000 shares of no par common stock. On June 30, 1956, 100 shares of petitioner's *208 stock were issued to Howard Jesse Coldiron for $1,000 cash. On January 1, 1957, 125 additional shares of petitioner's stock were issued to Howard Jesse Coldiron in exchange for various assets and liabilities of the Howard Jesse Coldiron Logging Company, a sole proprietorship. The corporate petitioner had no operations prior to January 1, 1957. Since that date, petitioner has been engaged in contract logging operations in the Gold Beach, Oregon vicinity. On January 15, 1957, petitioner entered into a logging contract with Evans Products Company, a Delaware corporation (hereinafter referred to as Evans). The logging contract provided that petitioner would log, remove, transport, and deliver to Evans at designated points all logs that could be produced from a designated area "and for said purposes except and unless herein otherwise expressly provided, Logger agrees * * * to complete the logging and delivery thereof during the year 1957." The logging contract provided generally for the felling, bucking (sawing into lengths), yarding (collecting), loading, hauling, and delivery of all the merchantable peeler and mill grade logs that could be produced from the designated area and the *209 cleaning up of the area. The logs being delivered to Evans were first to be scaled on truck by the Columbia River Log Scaling and Grading Bureau (hereinafter referred to as the Bureau). The scaling reports of the Bureau were to be used as the basis of determining the amounts owed to petitioner by Evans. Paragraphs 11, 21, and 24 of the contract provided as follows: 11. All trees felled will be bucked by Logger and the logs therefrom delivered within six (6) months from the date of falling. * * *
21. Logger will burn and dispose of slash resulting from his operations at the times and in the manner required by law and will obtain from the Forestry Department the release of each of the areas where slash is disposed of and will deliver the releases to Evans promptly on issuance. The Parties agree that from the sums herein provided to be paid to Logger, Evans may withhold the sum of One ($1.00) Dollar per thousand feet net log scale for all logs delivered from the said logging areas, which withheld sum shall be for the purpose of indemnifying Evans to the extent of the sums withheld against Logger's failure to dispose of slash and against loss, damage or expense resulting from *210 Logger's failure to perform any other of his agreements herein. * * *
24. In consideration of the agreements of Logger, Evans agrees to pay to Logger for all logs delivered hereunder at Evans' Euchre Creek Plant and scaled as herein provided, at the rate of Twenty-one ($21.00) Dollars per thousand feet net log scale; and for all logs delivered hereunder by Logger to Evans' Hunter Creek Plant, at the rate of Twenty-four ($24.00) Dollars per thousand feet net log scale. Payments at said rates less sums withheld under terms of this agreement will be made on the fifteenth (15th) day of each calendar month for all such logs delivered and scaled during the previous calendar month. Petitioner started logging operations pursuant to the contract on or shortly after January 15, 1957. The first work done in the logging operation was felling and bucking. After that logs were loaded, delivered, and scaled. Starting with the first operations and continuing through the rest of 1957, petitioner requested and received from Evans advances of various amounts of money to enable it to meet its payroll and trucking and similar expenses necessary in the performance of the contract. Such amounts *211 were paid on or about the 10th and 25th of the months when petitioner had to meet its payroll. The amount of these payments usually varied between $20,000 and $40,000. The scaling reports made by the Bureau were sent to Evans and were the basis of settlement sheets made out by Evans showing the amount and price of the logs delivered. The advances made by Evans would be applied against the amount due petitioner upon delivery of the logs as shown by the scaling reports and any excess was treated on the books of Evans as an overadvance. There was usually a 2 to 3-month lag in the making of these settlement sheets from the time the logs were actually delivered and scaled. When a request was made by petitioner for an advance, Evans would determine the amount to be advanced by the volume of logs that had been delivered but not yet credited to petitioner, and by the number of logs felled and bucked in the woods but not yet delivered. Evans also, to some extent, relied on the good personal character of Howard Jesse Coldiron. In determining the quantity of logs felled and bucked but still remaining in the woods, Evans followed the practice of examining cutting reports, prepared by one of *212 its foresters, covering areas being logged. It was the general policy of Evans not to advance amounts in excess of the value of the logs actually delivered plus the value of the logs felled and bucked but not yet delivered. At times petitioner received an advance of a greater sum than was requested and at other times a lesser amount was received. There was no discussion between petitioner and Evans concerning the manner in which the advances would be treated. The cutting report, prepared by Evans' forester on December 20, 1957, disclosed that at that time 5,100,000 board feet of logs were felled and bucked in the woods. Evans valued these logs at $5 per thousand for a total of approximately $25,000. As of December 31, 1957, the logging advance account on the books of Evans disclosed a balance of $44,504.35 representing the advances made to petitioner in excess of completed log deliveries. Of this amount petitioner included in income in 1957 $20,254.67 representing amounts withheld as slash deposits. On petitioner's income tax return for 1957 under the designation "Schedule L - Item 19 - Other Liabilities" was shown, among other items, the following: "Performance Liability - Logging *213 Advances - $44,504.35." The settlement sheet showing the amount of advances from Evans to petitioner as of December 31, 1957, in excess of credits for log deliveries as of that date was not received by petitioner until over 2 months after the end of the year and it was not until receipt of this settlement sheet that petitioner knew the amount, if any, of the overadvance. The stipulated facts are found accordingly. Opinion Petitioner contends that the $24,249.68 received in excess of the amount due to it for logs delivered to Evans plus the withholding by Evans for indemnity against loss for failure to dispose of slash was in the nature of a general obligation or debt owed to Evans and, therefore, does not constitute income for 1957. Respondent takes the position that the entire $44,504.35 was an advance payment received by petitioner under a claim of right for services rendered or to be rendered and, hence, constituted income to petitioner when it was received. Petitioner states that Evans treated the $44,504.35 amount as an "overadvance" on its books and petitioner regarded the amount in the same fashion on its 1957 income tax return. Petitioner argues that there was no agreement *214 or contract between the two parties respecting the year 1958; therefore, the subject amount could not, on December 31, 1957, constitute income for services to be rendered in the future. Petitioner's president testified that no contract, written or oral, had been entered into for the year 1958 as of December 31, 1957. Although the contract here involved provided that the logger (petitioner) agreed "to complete the logging and delivery thereof during the year 1957", it also provided that all trees felled would be bucked by petitioner and the logs therefrom delivered within 6 months from the date of felling. There was a substantial amount of trees felled as of December 20, 1957, from which the logs had not been delivered to Evans. Insofar as the evidence shows, this situation also prevailed on December 31, 1957. The clear implication from these facts is that petitioner was obligated to deliver logs to Evans during 1958. Petitioner further contends that inasmuch as the contract called for payment only when the logs were delivered and scaled, the $44,504.35 amount was not received by petitioner under a claim of right under the contract. It is clear to us that the parties amended their *215 contract by an understanding and practice providing for payments by Evans in advance of the delivery of the logs by petitioner and the subsequent charging against such advances of amounts determined to be due for the logs delivered. There is no evidence in the record that petitioner during 1957 received payment under the contract in any other manner. Considering all the evidence, we hold that the amount of the advances was received under a claim of right for services to be rendered and thus constitutes income at the time of receipt. It has been clearly established that, under the "claim of right" doctrine, prepaid income must be reported as income in the year of receipt. , and cases there cited. Although petitioner requested and received the amounts to enable it to meet necessary expenses in the performance of the contract, there was no restriction placed by Evans upon the use to be made by petitioner of the money advanced. Thus, in the instant case, as in the Andrews case, the advances were received by petitioner free of any restrictions as to their use. The advances were, in fact, used by petitioner to its advantage, primarily *216 in defraying expenses incurred in the performance of its contract. Petitioner cites ; , affd. (C.A. 7, 1952); and . Each of these cases is clearly distinguishable on its facts from the instant case. In the Summit Coal Co. case, the taxpayer had entered into an agreement whereby it was to receive advances of $150,000 to be used to pay its then outstanding indebtedness and to develop its mining properties. Notes were given for the money advanced. Repayment was to be made at the rate of $1 per ton of coal delivered with a final date for repayment set. On the basis of the facts therein the advances were held to constitute loans. The fact that one of the parties in the instant case treated the $44,504.35 amount on its books as "overadvances" and the other party considered the amount in somewhat the same light is not persuasive that the advances constituted a loan. These entries are as consistent with advance payment for services to be rendered as with the creation of a general indebtedness. *217 Furthermore, even if the bookkeeping entries could be said to show that the advances were treated as a loan, the entries would be merely evidence of the fact they purported to show and not conclusive. Cf. and cases there cited, affd. (C.A. 2, 1959). Petitioner did not give notes for the amounts advanced. It did not pay interest on the amounts advanced. There was no specified time for repayment. In fact, petitioner did not know that an overadvance existed until approximately 2 months after December 31, 1957. On the basis of the evidence, we hold that the advances in the instant case did not constitute loans. In the Bates case the petitioner charged the United States Government an excessive amount for freight services rendered, knowing that the charge was excessive and that part of the amount received would have to be returned. Under these circumstances the Court held that petitioner did not receive the excessive amounts under a claim of right. In the Veenstra & DeHaan Coal case, petitioner received advances or deposits from customers to be applied on the price of coal and coke to be charged by *218 petitioner when and if the coal and coke were sold and delivered to the customers. This Court stated that at the time the deposits were made it was impossible to determine what if any income (excess of sales price over cost) would be made on the eventual sale because at the time the deposits were made there was only an executory and contingent contract to sell unascertained goods at an unspecified price, which were to be acquired if possible, by petitioner at a cost unknown to it at the time the deposits were received. Consequently, this Court held the deposits did not represent income at the time of receipt. In the present case we do not have a deposit on an executory and contingent contract to sell goods but an advance on a contract to perform services. The $24,249.68 representing advances to petitioner is includible in its income in 1957. Certain issues raised in the pleadings have been conceded by each party. Decision will be entered under Rule 50.